# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| PATRICK GINGRAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 06 C 2195 |
| | ) |
| PRUDENTIAL INSURANCE | ) |
| COMPANY OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Patrick Gingras brings this action under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1)(B), to contest Prudential Insurance Company of America's denial of his claim for long term disability benefits. The parties have cross-moved for summary judgment. The parties have also stipulated that should the Court find that genuine issues of material fact preclude summary judgment for either party, the Court may enter judgment pursuant to Federal Rule of Civil Procedure 52. For the following reasons, the Court denies the parties' motions for summary judgment and declines to enter judgment on the parties' written submissions.

### Facts

Patrick Gingras was employed as a financial services advisor with Bank One Corporation (now JPMorgan Chase & Co.) at its credit card operation in Elgin, Illinois. As a financial

services advisor, Gingras worked forty hours per week handling telephone inquiries from customers regarding their credit card accounts. Gingras participated in Bank One's long-term disability plan, which is insured and underwritten by Prudential. The plan provided Gingras with a monthly benefit of 70% of his salary should he become permanently disabled.

Gingras stopped working on May 27, 2003. He submitted a claim for short-term disability benefits, claiming that he suffered from depression, panic disorder, HIV/AIDS, sleep apnea, and back pain. After waiting the required 182-day elimination period, the period after a disability begins but before benefits are available, Gingras applied for long-term disability benefits. On October 21, 2003, Prudential denied Gingras' claim because, it contended, the medical evidence submitted by Gingras' treating physicians did not provide evidence of an impairment that would prevent him from performing his duties as a financial services advisor.

Prudential's plan provides for two internal appeals of a denial of benefits. On June 2, 2004, Gingras filed his first appeal. Gingras provided Prudential with narrative reports from the following individuals: Dr. Frank Pieri, psychiatrist; Dr. Michael Friedman, ear, nose, and throat specialist; Dr. David Blatt, HIV/AIDS physician; Dr. Warren Jablonsky, orthopedic surgeon; and Richard McCoy, chiropractor.

Dr. Pieri diagnosed Gingras with generalized anxiety disorder, major depressive disorder, and panic disorder without agoraphobia. With regard to Gingras' ability to work, Dr. Pieri wrote that

> [i]n general, Mr. Gingras has a number of medical conditions that, in combination with his psychiatric condition, make it quite difficult for him to perform [his] job duties . . . . Specifically, the number of hours per day and consecutive days worked place a great deal of stress on him and thereby exacerbate his psychological symptoms . . . . These psychological difficulties would make it more problematic for him in terms of his attention and concentration, decreased

2

memory, increased fatigue, and difficulty focusing; and increased anxiety would also clearly impair his ability to focus and concentrate.

At times, when he was working, he may possibly have been able to perform these duties with some reasonable accommodations as defined within the ADA guidelines. My understanding is that his employer was either unwilling or unable to accommodate him. This situation exacerbated his symptoms and caused him to become more and more anxious, have increased panic attacks, and experience increased depressive symptoms to such a degree that he was no longer able to work. Since that time, after approximately a year of intensive treatment, including some intensive outpatient hospital treatment, he has begun to stabilize; but clearly, this has occurred only recently and with this, any additional stress clearly exacerbates his symptoms.

Pl. Ex. 6, Tab K.

Dr. Friedman, who treated Gingras for severe obstructive sleep apnea, stated that in late 2003 Gingras began falling asleep during the day. By the end of November 2003, Gingras had "severe daytime somnolence that was incapacitating." *Id.*, Tab P. Dr. Friedman opined that because of the sleep apnea, Gingras "is not capable of functioning or maintaining any full time employment." *Id.*, Tab M. Dr. Friedman continued,

> [w]ith regard to his ability to function at work, I would offer the following guidelines – he is not capable of maintaining continuous wakefulness in order to [sic] phone calls or to interact with customers on a continuous basis. He obviously has intermittent episodes of strength and somnolence, which alternate and cannot be predicted. His poor level of alertness makes him a poor candidate for tracking phone calls. He would not be able to advise team manager of call-type trends.
>
> ....
>
> Overall, I will summarize his condition as being that of severe fatigue and daytime somnolence which are generalized conditions. Therefore, he is not employable at the present time. His prognosis is poor due to his terminal condition.

*Id.*

Dr. Blatt wrote that Gingras "suffers severe depression and anxiety and is under the care

of a psychiatrist. He continues to refuse treatment of his HIV, but is on a plethora of medication for the above problem and for nausea and hyperacidity. He does also have evidence of a mild right ulnar neuropathy which could adversely affect his ability to do the duties outlined at his computer." *Id.*, Tab L.

> Dr. Jablonsky stated that
>
> [a]t this time his current limitations inherent to his medical condition with regard to his work would include only essentially the ability to prevent continued pressure to the medial aspect of his right elbow in the region of the ulnar nerve anterior transposition. Otherwise if he may perform occasional stretching exercises or repositioning of the elbow at times to relieve any of this pressure, he should be allowed or continued to work.
>
> ....
>
> Regarding your inquiry of his ability to answer incoming telephone calls related to credit card inquiries or disputes, I would anticipate that he should be able to continue with his activities. If he has ongoing or worsening ulnar nerve symptoms or if ergonomic suggestions are not successful then he may have difficulty performing this job repetitively over a ten-hour period during the day. Regarding the remainder of your listed inquiries, I see no problem with his continued performance of those activities. He should be able to perform sitting tasks without significant limitation for the pertinent diagnoses that I am treating.

*Id.*, Tab M.

Richard McCoy, Gingras' chiropractor, wrote that "[i]f the stress-emotional was not a factor and still the eye complaint, I feel that Mr. Gingras could perform his work duties as before even though he had a shattered elbow and taking medications for HIV." *Id.*, Tab J.

After Gingras provided these reports during his appeal of the denial of benefits, Prudential retained Dr. Steven Feagin to review Gingras' file. Prudential asked Dr. Feagin to consider the following questions: is there documentation for a psychiatric or physical sickness or injury during the elimination period; is there documentation of a psychiatric or physical

sickness or injury from the end of the elimination period through the date of Dr. Feagin's review; if so, what effect on Gingras' function would the sickness or injury have; and what would be appropriate restrictions and limitations on Gingras' ability to work and for what length of time. Dr. Feagin concluded that "taking claimant's problems in [the] aggregate, [there was nothing] that would demonstrate limitations or necessary restrictions beyond those seen from the problems individually." *Id.*, Tab F.

Dr. Feagin acknowledged that Gingras had multiple conditions but stated that "only the psychiatric issues appear to have caused significant ongoing impairment during the elimination period. These appear to have stabilized during the elimination period . . . ." *Id.* Dr. Feagin opined that prior to the elimination period, Gingras' psychiatric issues would have been an appropriate basis for him to have been restricted from work. He did not believe, however, that Gingras had any physical impairments that would limit him from "sedentary, light or medium work endeavors." *Id.* On October 27, 2004, Prudential denied Gingras' appeal based on Dr. Feagin's opinion.

On December 1, 2004, Gingras filed a second appeal. He submitted additional letters from Dr. Ronald Hirsch, an internist, and Dr. Steven Meletiou, an orthopedist, as well as additional medical records from Dr. Jablonsky, Dr. Pieri, and chiropractor McCoy.

Dr. Hirsch wrote that

> [i]n regards to his ability to work, Mr. Gingras has several serious diseases that all have central nervous system manifestations. Syphilis can cause memory deficits and problems with gait and balance. HIV/AIDS is well-known to cause multiple neurological abnormalities including dementia (progressive memory loss), fatigue, difficulty concentrating, sleep disorders, nerve damage causing neuropathy and muscle damage causing pain and weakness. He has been diagnosed with sleep apnea with [sic] commonly causes daytime sleepiness, fatigue and difficulty concentrating. His psychiatric illnesses originate in the

5

brain and have protean manifestations.

As to his ability to perform the duties of his job as you have outlined them and my three visits with him since January, I do not feel that he can adequately perform those duties nor do I feel that his work performance would be appropriate to the expectations. Formal neuropsychiatric testing could be performed to formally document the mental deficits that are apparent during my encounters. Furthermore, I would not want my credit card inquiry to be handled by Mr. Gingras.

*Id.*, Tab G.

Dr. Meletiou wrote that

[w]ith respect to the patient's ability to perform the substantial duties of his regular occupation this is somewhat difficult to assess. This is his dominant hand. His dominant hand will be used for writing, as well as mouse use and significant activities that are somewhat repetitive. While his elbow marginally limits his ability to perform his job his cubital tunnel syndrome substantially impairs the function of his right hand and substantially impairs his ability to perform his job to the fullest. It is somewhat impossible to say whether or not he can perform all of these duties. Certainly activities that involve substantial periods of typing, mouse use, and writing for several hours a day are likely to be impossible for him to do particularly on a daily basis. Some of the job descriptions which you describe which would involve answering telephone calls, guiding the t-manager [sic] of call type trends, sharing pertinent information with peers and management, etc. would be quite doable. Significant use of the computer, the keyboard, and the mouse for ten hours per day however would likely be challenging and difficult for him in view of the cubital tunnel syndrome.

*Id.*, Tab H.

On June 15, 2005, Prudential referred Gingras' file to Dr. John LoCascio for review. Dr. LoCascio, an internist, stated that

[t]he claimant may have sustained capacity for [s]edentary activity in the intervals between acute exacerbations. It is also likely that the [c]laimant's Axis I psych diagnoses (depression and anxiety) as well as pre-morbit [sic] psychological characteristics make symptom reporting exaggeration likely. However, the number of conditions and the complexity of their interactions make this difficult to determine.

Def. App. A.

Prudential referred Dr. LoCascio's opinions and recommendations to Reed Review Services, a company providing independent file review services. The file review was performed by Dr. Phillip Marion, a pain and physical medicine rehabilitation specialist, and Dr. Marcus Goldman, a psychiatrist. Dr. Marion concluded that Gingras

> has objective impairments related to his right elbow, right knee and lumbar spine. The patient should be permanently restricted to light duty to sedentary activities. Maximal lifting should be restricted to 20 pounds. Activities such as bending, stopping [sic], crawling, squatting, crouching and kneeling should be limited to occasionally. He should be provided an elbow pad to relieve the pressure of the right elbow while performing routine keyboard work. There is no formal neuropsychological testing report in the enclosed clinical records available for review documenting any specific cognitive deficits.

*Id.*

Based on a review of Gingras' file, Dr. Goldman concluded that

> [s]ufficient legible objective data simply does not exist to support a debilitating psychiatric or cognitive condition that would preclude work. Dr. Pieri's notes are almost entirely subjective in nature. They contain no serial or well detailed mental status examinations. There are no data objectively detailing deficits in his global psychiatric functioning. He is apparently able to attend AA meetings with great weekly frequency. There are no measured cognitive tests – not even a MMSE examination, indicating a dementing illness or any other deficit in cognition. He is not noted to be suicidal or homicidal and there are no data supportive of psychosis. Complaints of panic attacks are purely subjective – there are no corroborative data to support this and he was not described as anxious in session. Despite complaints of fatigue, Dr. Pieri consistently, with very few exceptions, noted no side effects to medications and nowhere in this record was he objectively described as somnolent on examination. A diagnosis of PTSD was noted but no where in this record are there any data supportive of a trauma consistent with such a DSM diagnosis, nor are there any detailed signs associated with such an illness. Finally, those suffering from very severe depressive episodes are generally anhedonic and have no libido. This claimant requested change from Viagra to Cialis and was noted to be sexually active. This behavior is not consistent with a melancholic, severe, vegetative depression.

Pl. Ex. 6, Tab O.

On October 25, 2005, Prudential denied Gingras' second appeal. On April 19, 2006,

7

Gingras filed this action challenging Prudential's denial of benefits.[1]

## Discussion

On cross motions for summary judgment, the Court construes facts and draws inferences "in favor of the party against whom the motion under consideration is made." *In re United Air Lines, Inc.,* 453 F.3d 463, 468 (7th Cir. 2006) (citation and internal quotation omitted). Entry of summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

**1.      Standard of review**

The parties disagree regarding the appropriate standard of review. Gingras contends that the Court should review Prudential's decision to deny benefits *de novo*. An employee "presumptively has a right to an 'informed and independent judgment' on his claim for benefits – informed by evidence as the court thinks necessary, and fully independent of the plan administrator's findings and reasoning." *Patton v. MFS/Sun Life Fin. Distrib.,* __ F.3d __, 2007 WL 730557, at *6 (7th Cir. Mar. 12, 2007) (citing *Quesinberry v. Life Ins. Co. of N. Am.,* 987 F.2d 1017, 1025 (4th Cir. 1993)). Prudential contends that its denial of benefits should be

---

[1] Gingras has submitted an amendment to his Rule 56.1 statement stating that the Social Security Administration recently determined that he became disabled on May 21, 2003, and discussing *Patton v. MFS/Sun Life Fin. Distrib.,* __ F.3d __, 2007 WL 730557, at *6 (7th Cir. Mar. 12, 2007), a case decided after the parties' summary judgment papers had been filed. Prudential has filed a response to Gingras' new factual submission or, in the alternative, a motion to strike. Prudential also responded to Gingras' citation to *Patton*. The Court has not relied on the Social Security Administration's determination regarding Gingras' entitlement to social security benefits because it is not material to the resolution of the cross-motions for summary judgment. The Court has considered both parties' arguments regarding *Patton*.

reviewed under an arbitrary and capricious standard because the ERISA plan gives Prudential discretion to approve or deny claims.

Prudential has the burden of establishing that the language of the plan gives it discretionary authority. *Sperandeo v. Lorillard Tobacco Co.*, 460 F.3d 866, 870 (7th Cir. 2006). To alter the default *de novo* standard, "the stipulation for [deferential review] must be clear." *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 332 (7th Cir. 2000).

Prudential contends that the plan grants it discretion for two reasons. First, the policy states that an employee is disabled when "Prudential determines that" certain factors exist and the employee provides proof "satisfactory to Prudential." Def. R. 56.1 Stat. at ¶¶ 22, 23. Second, an "ERISA statement," allegedly provided to employees with the plan documents, states that "[t]he decisions of the Claims Administrator shall not be overturned unless arbitrary and capricious." *Id.* at ¶ 28.

Prudential has not carried its burden of proving that its decision to deny Gingras benefits is entitled to a deferential standard of review. The Seventh Circuit has expressly rejected application of a discretionary standard of review based on policy language similar to that cited by Prudential. In *Diaz v. Prudential Ins. Co. of Am.*, 424 F.3d 635 (7th Cir. 2005), the court stated that the critical question is notice: "participants must be able to tell from the plan's language whether the plan is one that reserves discretion for the administrator." *Id.* at 637 (citing *Herzberger*, 205 F.3d at 332). A plan's requirement that an applicant must submit "'satisfactory proof of entitlement' does not necessarily mean that a plan administrator has discretion, because every plan requires submission of documentary proof . . . ." *Diaz*, 424 F.3d at 637 (citing *Herzberger*, 205 F.3d at 332). Rather, plan documents must include language that

9

"either mimics or is functionally equivalent" to the "safe harbor" language the Seventh Circuit has suggested. *Diaz*, 424 F.3d at 637. The court has held that the following language is sufficient to provide a plan participant adequate notice of discretionary review: "[b]enefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them." *Id.* (citation omitted).

In *Diaz*, the court held that Prudential's language was not sufficiently similar to the proposed safe harbor language to give an employee adequate notice that the plan administrator "has the latitude to shape the application, interpretation, and content of the rules in each case" and thus the district court should have applied a *de novo* standard of review. *Id.* at 640. In this case, the plan language is similarly insufficient to confer discretionary authority on Prudential.

Prudential also cannot rely on the ERISA statement to support its claim that it is entitled to a deferential standard of review. Only plan documents can be used to confer discretionary authority on an insurer. *Schwartz v. Prudential Ins. Co. of America*, 450 F.3d 697, 699-700 (7th Cir. 2006); *see also Sperandeo*, 460 F.3d at 871 (discretionary language in certificate of insurance and summary plan description did not confer discretionary authority on plan administrator when those documents were expressly not part of the plan documents). In this case, the plan documents include a group insurance contract and a group insurance certificate.

The contract consists of

> (1) the Group Insurance Certificate(s) listed in the Schedule of Plans; (2) all modifications and endorsements to such Group Insurance Certificates which are attached to and made a part of the Group Contract by amendment to the Group Contract; (3) the forms shown in the Table of Contents as of the Contract Date; (4) the Contract Holder's application . . .; (5) any endorsements or amendments to the Group Contract; and (6) the individual applications, if any, of the persons

10

ensured.

Pl. Ex. 6, Tab A.

The certificate of coverage states that it "tells [a participant] . . . the coverage to which you may be entitled; to whom Prudential will make a payment; and the limitations, exclusions and requirements that apply within a plan." *Id*. Moreover, the ERISA statement states that it "is not part of the Group Insurance Certificate." *Id*. In short, the ERISA statement is not a plan document and cannot be the source of the discretionary review Prudential claims to have. Accordingly, the Court will review Prudential's denial of benefits *de novo*.

### 2. Entitlement to summary judgment

Prudential and Gingras both claim that they are entitled to summary judgment. Though there is no dispute regarding the contents of the doctor's reports, the parties vigorously disagree regarding the inferences to be drawn from the reports and whether Gingras is permanently disabled. Most importantly, however, each party disputes the credibility of the other's doctors. Prudential contends that Gingras' doctors are biased and "advocates," Def. Amend. Reply at 7, and Gingras contends that the doctors retained by Prudential are "career in-house physician[s]" for insurers. Amend. Mem. at 12. A court may not assess the credibility of witnesses or draw inferences at the summary judgment stage. *Paz v. Wauconda Healthcare and Rehabilitation Centre, LLC,* 464 F.3d 659, 664 (7th Cir. 2006) ("[a]t summary judgment, 'a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for the factfinder.'") (citation omitted). The Court therefore denies both parties' motions for summary judgment.

### 2. Rule 52 judgment

Both parties have stipulated that, should the Court deny summary judgment, the Court may weigh the evidence and make findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. Because, however, resolution of this matter hinges on the credibility of the parties' witnesses, the Court declines to enter a Rule 52 judgment based on the parties' written submissions. Rather, as the trier of fact (Gingras is not entitled to a jury trial on his ERISA claim), the Court must hear testimony from the treating and consulting physicians. Prudential and Gingras each place great weight on the credibility of their own doctors in contrast to the alleged bias of the other party's physicians. It simply is not possible for the Court to make the credibility determinations the parties argue are necessary by reviewing only the paper record.

**Conclusion**

For the reasons stated above, the Court denies both parties' motions for summary judgment [docket nos. 22 & 32], as well as defendant's motion to strike or to file a surreply [docket no. 59]. The case is set for a status hearing on April 12, 2007 at 9:30 a.m. for the purpose of setting a trial date.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: April 4, 2007